UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

NEW CINGULAR WIRELESS PCS, LLC
D/B/A AT&T MOBILITY,

For Online Publication Only

**FILED**
**CLERK**

3/31/2026 12:32 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

Plaintiff,

-against-

THE VILLAGE OF OYSTER BAY COVE, THE
ZONING BOARD OF APPEALS OF THE VILLAGE
OF OYSTER BAY COVE, AND THE PLANNING
BOARD OF THE VILLAGE OF OYSTER BAY COVE,

Defendants.

--------------------------------------------------------------------X

**MEMORANDUM & ORDER**
22-cv-07807 (JMA) (ST)

**AZRACK, United States District Judge:**

In December 2022, Plaintiff New Cingular Wireless PCS, LLC d/b/a AT&T Mobility ("AT&T") filed this federal lawsuit against Defendants the Village of Oyster Bay Cove, the Zoning Board of Appeals of the Village of Oyster Bay Cove, and the Planning Board of the Village of Oyster Bay Cove, (collectively, "Defendants"). AT&T alleges that Defendants violated the Telecommunications Act of 1996 (the "TCA"), 47 U.S.C. § 332, et seq., and New York law, when they denied AT&T's application to construct a wireless services facility on municipal property. (See ECF No. 1 ("Compl.").) AT&T seeks summary judgment on all claims brought pursuant to the TCA and an injunction compelling Defendants to approve its application. (See ECF No. 55-24 ("Mot.").) For the reasons that follow, Plaintiff's motion is GRANTED.

**I.      BACKGROUND**

**A.  Factual Background**

The following facts are taken from AT&T's Rule 56.1 Statement, (ECF No. 55-1 ("Pl. 56.1 Stmt.")); Defendants' Response to AT&T's Rule 56.1 Statement, (ECF No. 55-26 ("Def. Res. 56.1

Stmt."")); and the evidentiary materials cited therein.  Defendants did not submit a Counter Rule 56.1 Statement.  Unless otherwise noted, each fact included below is undisputed.[1]

## 1. The Parties

Plaintiff AT&T is licensed by the Federal Communications Commission ("FCC") to provide wireless services.  (Def. Resp. 56.1 Stmt. ¶ 1.)  AT&T provides services through "an interlocking network of line-of-sight transceiver facilities."  (Id. ¶ 2.)  These transceivers send and receive radio signals, which are "subject to disruption caused by topography, foliage, and man-made structures, as well as range limitations inherent in the use of low-powered signals that permit frequency reuse."  (Id. ¶ 3.)  AT&T's facilities enable it to provide access to 911 calls (at least 70% of which are made from wireless devices), as well as to support FirstNet, a national public safety broadband network for first responders.  (Id. ¶¶ 4, 7.)

Defendant the Village of Oyster Bay Cove (the "Village") is an incorporated village located within the Town of Oyster Bay in Nassau County, New York.  (Compl. ¶ 2.)  Defendant the Zoning Board of Appeals of the Village of Oyster Bay Cove (the "Zoning Board") is the Village's duly constituted zoning board of appeals, and the Planning Board of the Village of Oyster Bay Cove (the "Planning Board") is the Village's duly constituted planning board, pursuant to New York law.  (Id. ¶¶ 3–4.)

---

[1] Unless otherwise noted, a citation to a party's Rule 56.1 statement indicates that the Court has deemed the relevant fact undisputed.  Any citation to a party's Rule 56.1 statement incorporates by reference the underlying documents cited in the statement.  Where relevant, the Court may cite directly to an underlying document.  The Court notes that, although Defendants refer to a "Counter Rule 56.1 Statement" in their memorandum of law opposing Plaintiff's motion, Defendants did not in fact submit a Rule 56.1 statement of their own and instead cite directly to the record in their opposition brief.   (See ECF No. 55-25 ("Def. Opp.") at 10).  Defendants did submit a response to Plaintiff's Rule 56.1 statement.  (See Def. Res. 56.1 Stmt.)  The Court also notes that many of the responses where Defendants purport to deny one of Plaintiff's statements of material fact are improper in that they either do not actually controvert the facts set forth in Plaintiff's 56.1 Statement, or they purport to deny facts properly set forth by Plaintiff's 56.1 statement with a citation to evidence that does not support the purported denial. See Potash v. Fla. Union Free Sch. Dist., 972 F. Supp. 2d 557, 564 (S.D.N.Y. 2013).  The Court deems undisputed Plaintiff's facts that are supported by citations to record evidence and are not specifically disputed with relevant citations to admissible record evidence. See Santander Consumer USA, Inc. v. City of Yonkers, No. 22-cv-8870, 2024 WL 4817649, at *1 (S.D.N.Y. Nov. 18, 2024) (citing Mae v. Quickway Estates LLC, No. 22-cv-3048, 2023 WL 6162927, at *1 n.2 (S.D.N.Y. Sept. 21, 2023)).

## 2. The Proposed Facility

In the Village of Oyster Bay Cove, there is an area adjacent to Route 25A—including a 1.14 mile stretch of road between Berry Hill Road and Cove Road, and a 0.4 mile stretch to the south of the intersection of Berry Hill Road and Route 25A—where AT&T is unable to provide reliable access to services from its network to either in-building or in-vehicle users (the "service gap" or "gap"). [2] (Def. Res. 56.1 Stmt. ¶¶ 10–12, 63.)  Over 16,000 vehicles a day travel through the service gap.  (Id. ¶ 18.)

Since at least 2021, AT&T has sought to remedy the service gap by constructing a wireless services facility (the "Facility") at the Village's police department headquarters, located at 30 Northern Boulevard, Oyster Bay, New York (the "Site").  (Id. ¶ 23.)  The Site is "municipal property located in the center of the service gap in an area otherwise consisting of single-family residential property."  (Id. ¶ 24.)  The Village is zoned entirely residential, and therefore contains no commercial, industrial, institutional or other nonresidential areas where a facility could be placed away from residential users.  (Id. ¶¶ 22.)

The Facility would consist of an 85-foot-tall monopole disguised as a pine tree (a "monopine") and be placed within a fenced area at the rear of the Site.  (Id. ¶ 25.)  The total height of the Facility would be 85 feet above ground level, with an antenna height of 75 feet.  (Id.)  There is a mixture of mature deciduous and evergreen trees on the Site ranging from 75 to 90 feet in height, with foliage underneath the tree canopy.[3]  (Id. ¶ 27.)  The Facility would not be widely visible from adjacent neighborhoods nor from the Village in general.  (Id. ¶ 73.)

---

[2] As explained infra, Defendants dispute the existence of a "service gap" and claim that AT&T should have provided additional evidence to confirm the gap in service. (See, e.g., Def. Res. 56.1 Stmt. ¶¶ 10–12; Def. Opp. at 7.) However, Defendants do not cite to any evidence that AT&T can currently provide reliable service in the relevant area, and AT&T produced propagation plots and drive tests showing that it cannot. (See Def. Res. 56.1 Stmt. ¶ 63; see infra Part II.B).  Accordingly, the Court deems it undisputed that there is a "service gap."

[3] Here, as in other instances, Defendants do not dispute the existence of trees of that height on the Site—but instead claim that photo simulations provided by AT&T "clearly demonstrate" the Facility would "tower over nearby trees."

3

### 3. The Application

On November 16, 2021, the Village Board of Trustees adopted a resolution authorizing the Village to enter a lease with AT&T to construct, maintain, and operate the proposed Facility. (Def. Res. 56.1 Stmt. ¶¶ 33–34; see also ECF No. 55-11.) As a condition for the lease, the Board of Trustees limited the height of the monopole to 85 feet, the minimum height needed to remedy the service gap, and required that it be covered by "extensive monopine camouflage." (Def. Res. 56.1 Stmt.¶ 26.) The lease required AT&T to obtain necessary government approvals, including site plan approval from the Planning Board and variances from the Zoning Board. [4] (Id. ¶¶ 34–39.)

On December 6, 2021, AT&T applied for the necessary approvals (the "Application"). (Id. ¶ 43.) The Application included an explanation of the factual and legal grounds for approval and a site plan of the proposed Facility. (Id. ¶ 44; see also ECF No. 55-6.) The Application also included: (i) a zoning, planning and visual impact analysis, containing photo simulations of the Facility; (ii) an affidavit and report from Neil Arceo, a qualified radio frequency ("RF") engineer, containing predictive "propagation maps"; (iii) a certificate of compliance with FCC regulations; (iv) a building permit application; (v) an environmental assessment form documenting that the Facility would not have a significant adverse environmental impact pursuant to the State Environmental Quality Review Act; and (vi) an "alternatives analysis" conducted by a site acquisition specialist. (Def. Res. 56.1 Stmt. ¶¶ 44–49; see also ECF Nos. 55-6, 55-7, 55-8, 55-9, 55-10.)

---

(Def. Res. 56.1 Stmt. ¶ 27.) Because Defendants failed to specifically controvert the fact in question, and that fact is supported by admissible record evidence, the Court deems it undisputed. (See supra n.1.)

[4] The variances needed were to: (1) increase the Police station's lot area coverage by approximately 0.1%; (2) reduce rear-yard setback by 15 feet; (3) exceed the height to setback ratio variance; and (4) increase the height of a screening fence from six feet to eight feet. (Def. Res. 56.1 Stmt. ¶ 40.) Because the Facility would be housed on municipal property, AT&T was not required to obtain a special use permit. (Id. ¶ 36.)

The propagation maps submitted with the Application, together with Arceo's corresponding affidavit and report, demonstrate both the existing gap in coverage and the extent to which the Facility will improve coverage at two frequency bands, 700 MHz and 1900 MHz.[5] (Def. Res. 56.1 Stmt. ¶¶ 13–14; ECF No. 55-9 ("Arceo Aff.") ¶¶ 5–6.) The color-coded maps demonstrate signal strength for in-building coverage (green), in-car coverage (yellow), outdoor coverage (blue), and no reliable coverage (gray). (Arceo Aff. ¶ 6.) The report also includes a "coverage summary table" showing projected in-building and in-vehicle coverage with the Facility. (Id. ¶ 7.) The table shows the Facility would "introduce about 0.97 mile of new in-vehicle coverage at 700 MHz along the major section of N Hempstead Turnpike" and about 0.38 miles of in-building coverage. (Id. ¶¶ 8, 10.) For comparison, the maps also depict what the projected coverage would be if the antenna height was lowered from the proposed 75 feet to 65 and 55 feet. (Id. ¶¶ 7-8, 10; see also id., Ex. D-J). Those aspects of the maps demonstrate that lowering the antenna height reduces both in-building and in-vehicle coverage within the service gap. (Id.) Specifically, if reduced to 65 feet, in-vehicle coverage would decrease by approximately 34% for 700MHz and 24% for 1900MHz. (Id. ¶ 8.) If further reduced from 75 to 55 feet, in-vehicle coverage would decline by approximately 59% for 700MHz and 44% for 1900MHz. (Id.)

AT&T's Application also stated that the Facility was chosen as the least intrusive option and would have limited visual impact on the Village and the surrounding community. (Def. Res. 56.1 Stmt. ¶ 44; ECF No. 55-6 at 24.) To support that conclusion, AT&T submitted photo simulations of the proposed Facility prepared by an environmental engineer. (See ECF No. 55-8; Mot. at 15; see Def. Res. 56.1 Stmt. ¶¶ 73–78.) The accompanying visual analysis notes that the Facility was specifically designed "to resemble an evergreen tree of typical height for the area"

---

[5] 700 MHz is the lowest frequency band at which AT&T operates. (Def. Res. 56.1 Stmt. ¶ 13.) Higher-frequency signals do not propagate as far as lower-frequency; therefore, areas of inadequate signal strength are more widespread at higher frequencies, such as 1900 MHz, 2100 MHz, and 2300 MHz. (Id. ¶¶ 13–16.)

and to be "the least visually intrusive as possible." (See ECF No. 55-8 at 15–17; see Def. Res. 56.1 Stmt. ¶¶ 26–27.)

AT&T's "alternatives analysis," conducted by site acquisition specialist Victoria Brennan, explains that the chosen Site—which would place the Facility "nested in the trees along a heavily traveled thoroughfare"—was also chosen as the "least intrusive candidate." (ECF No. 55-10 ("Brennan Aff.") ¶¶ 8, 10.) The report explains that, given the predominantly residential nature of the area, there were no existing structures tall enough to support an antenna that could remedy the gap, and few sites that could accommodate a tower. (See id. ¶¶ 9, 11.) The report also notes that all viable tower sites require a "a willing landowner with whom commercially reasonable lease terms may be negotiated," and explains that a church across from the proposed Site was deemed unsuitable because the church was "not interested in having a cell site on the property" (and, moreover, was considered less preferable under Village Code than the chosen proposal). (Id. ¶ 10; see also Def. Res. 56.1 Stmt. ¶ 68.)

### 4.  The Village's Review of AT&T's Application

The filing of AT&T's Application commenced the running of the Federal Communications Commission ("FCC") "shot clock" rule, 47 C.F.R. § 1.6003(c), (e), which defines 150 days as the "presumptively reasonable time" within which all Defendants were required to render their decisions on the Application. (Def. Res. 56.1 Stmt. ¶ 51.) Under the "shot clock," the initial time for deciding the Application would have expired on or about May 5, 2022. (Id.)

The Village retained its own wireless consultant, CityScape Consultants, LLC, in reviewing the application, and in January 2022, sent a letter prepared by CityScape to AT&T, which commented on the Application and requested supplemental information. (Id. ¶ 52; see ECF No. 55-12, Ex. A.)  AT&T submitted responses to Defendant's queries and additional

documentation to Defendants on March 18, 2022. (Def. Res. 56.1 Stmt. ¶ 53; See ECF No. 55-12, Exs. C–E.)

After multiple extensions of the Shot Clock—with a final agreed-upon deadline of November 23, 2022—the Planning Board and Zoning Board each held two hearings on the application. (Def. Res. 56.1 Stmt. ¶¶ 54-60.) The Planning Board held hearings on August 4, 2022, and October 6, 2022, without reaching a decision. (Id. ¶¶ 56, 59, 62; see also ECF No. 55-32 ("8-4-22 Tr."); ECF No. 55-33 ("10-6-22 Tr.").) The Zoning Board held hearings on August 16, 2022, and November 22, 2022. (Def. Res. 56.1 Stmt. ¶¶ 57, 60; see also ECF Nos. 55-13 and 55-29 (together, "8-16-22 Tr."); ECF Nos. 55-14 and 55-34 (together, "11-22-22 Tr.").) At the November 22, 2022, hearing, the Zoning Board voted to deny AT&T's Application (the "Denial"), and it issued a written decision denying the Application on April 23, 2023. (Def. Res. 56.1 Stmt. ¶ 61; see ECF No. 55-5 ("Bd. Dec.").) The Planning Board still has not acted on the Application. (Id. ¶ 62.)

### 5. The Hearing Record

At the hearings, AT&T's RF engineer spoke about the service gap shown in the propagation maps, and how the Facility was the minimum height needed to remedy it. (Id. ¶¶ 64–65; see also, e.g., 8-16-22 Tr., 26:20–36:13.) AT&T also expanded on the Application's alternatives analysis, explaining why various alternative sites were not viable and could not remedy the gap. (Def. Res. 56.1 Stmt. ¶¶ 66–68.) For example, during the first Planning Board and Zoning Board meetings, each Board asked about the potential of placing an antenna on a water tower in a neighboring town. In response, AT&T submitted an additional alternatives analysis and RF report explaining that the water tower was too short and too distant to remedy the service gap, and too close to an existing AT&T facility to integrate into the AT&T network. (Id. ¶¶ 66–67; ECF No. 55-18, Ex. D ¶ 8; id. Ex. E, 3-4; see also 11-22-22 Tr., 14:14–16:21.)

The hearing record also contains considerable discussion of whether AT&T could use an "outdoor distributed antenna system," or ODAS, as an alternative to the Facility. (See, e.g., 8-16-22 Tr., 31:22–32:8, 36:14–37:11; 11-22-22 Tr., 17:1–18:7; Def. Res. 56.1 Stmt. ¶¶ 81–92.) An ODAS is a network of interdependent "nodes" which are typically mounted on existing utility poles at heights of twenty to forty feet. (Def. Res. 56.1 Stmt. ¶ 81.) In response to questions raised at the first hearings, AT&T submitted additional documentation explaining why an ODAS system would not provide sufficient coverage to remedy the in-building service gap, as the relatively short poles could not "provide reliable in-building service to homes on large lots set back from roads in a heavily-wooded setting." (Id. ¶ 81; see also ECF No. 55-18, Ex. E ¶ 5; 11-22-22 Tr., 17:1–18:7.) Moreover, because some roads in the service gap are private and lack existing utility poles, installing nodes there would require AT&T to secure individual leases and municipal approvals for each location. (Def. Res. 56.1 Stmt. ¶¶ 84, 89–91.) ODAS nodes also lack adequate backup power, which are critical to public safety uses.[6] (Id. ¶ 83.)

Several members of the public spoke before the Planning and Zoning Boards and voiced concerns regarding the Facility. Several residents challenged AT&T's conclusions derived from the propagation maps and questioned the existence of a service gap that the proposed Facility would address. For example, the Zoning Board chairperson, Sheryl Lerner, testified that several Board members commented that AT&T's maps showed a broader coverage gap that the Facility

---

[6] In support of its summary judgment motion, AT&T submitted two expert reports, prepared by a landscape architect and RF engineer, which further explain why an ODAS system is not a viable alternative and would not remedy the service gap. (See ECF No. 55-20 ("Allen Report") at 27–29; ECF No. 55-23 ("Villecco Report") at 28–30.) Defendants argue that these "belatedly submitted reports" are "worthless to resolving [AT&T's] failure to meaningful[sic] investigate less intrusive alternatives." (Def. Res. 56.1 Stmt. ¶ 82.) Although Defendants are correct that these reports are not relevant to the "substantial evidence" analysis (which is limited to the record before the Zoning Board), the reports are relevant to the Court's analysis of whether the denial constitutes an effective prohibition of service under the TCA. See New Cingular Wireless PCS, LLC v. Inc. Vill. of Muttontown, No. 22-cv-5524, 2025 WL 2467044, at *6 (E.D.N.Y. Aug. 27, 2025) ("For a prohibition of services claim, district courts may consider 'additional evidence beyond that which was introduced at the local level . . . and on a de novo basis.'") (citing Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 39 (1st Cir. 2014).

8

did not appear to remedy.  (Def. Res. 56.1 Stmt. ¶ 95; see ECF No. 55-15 ("Lerner Dep."), 41:17–42:24. Dec. 6, 2023.)  Others countered AT&T's evidence of poor signal strength, citing their own personal experience successfully making calls.  (Def. Res. 56.1 Stmt. ¶ 96; see e.g., 11-22-22 Tr., 135:9–136:16; Lerner Dep. 45:7; see also 8-16-22 Tr. 143:3–144:3.)

Residents also expressed concern that the Facility would be an "eyesore" for the surrounding area, that it would be even more visible in winter with less tree coverage, and that surrounding property values would decline.  (See, e.g., 8-16-22 Tr. 145:11–145:24; see id. 88:13–88:25, 115:12–119:2.)  Some residents also submitted exhibits in opposition to the Application. Two nearby homeowners submitted "adverse aesthetic impact letters" claiming that they would be able to see the tower from their homes and that their homes' values would decrease.  (See ECF No. 55-36, Ex. A.)  Residents also submitted photographs and drone footage taken from nearby homes.  (ECF No. 55-40; see, e.g., 11-22-22 Tr., 76:14–82:23; id. 108:2–115:20; 10-6-22 Tr. 93:1–94:24).

David Savetz, a nearby homeowner, submitted an appraisal report prepared by appraiser Oleg Sorkin.  Relying on a property in a neighboring town following the installation of a water tower, Sorkin opined that, if the proposed Facility were constructed, Savetz's home value could decline by as much as 9.5% to 20%.[7]  (See ECF No. 55-31, Ex. B; Bd. Dec. at 8–9; see also 8-4-22 Tr., 89:1–89:11.).  AT&T submitted both a response and its own "rebuttal appraisal report." (ECF No. 55-31 at 5–6; see id. Ex. C.)  AT&T argued that Sorkin's analysis was unreliable because the purported "comparable" property was not, in fact comparable—as it was located in a different Village, school district, and on materially different acreage—and that the "comparable" Facility, a large and highly prominent water tower, was also not comparable to the proposed "stealth

_____

[7] Savetz did not submit the report directly to the Board, but AT&T placed it into the record in responding to Sorkin's findings.

monopine design." (ECF No. 55-31 at 5–6.)  AT&T's rebuttal report drew on studies involving more analogous facilities and concluded that installations of the type proposed do not adversely impact property values.  (Id. at 6.)

### 6.  The Zoning Board's Denial

Although the Zoning Board voted to deny AT&T's application at its November 22, 2022 hearing, it did not issue a written decision until nearly five months later, on April 14, 2023.  (Def. Res. 56.1 Stmt. ¶ 61; see Bd. Dec.).  In its decision, the Zoning Board stated:

> The Board understands that, in accordance with Federal law and judicial precedent, it is the Applicant's burden to demonstrate based upon substantial evidence in the record that there is a 'public necessity' for the proposed facility in that: (i) there are significant gaps in coverage within the geographic range to be served by the project; and (ii) that the wireless facility in the specific location chosen is the least intrusive means of providing coverage within the affected area . . . While the Board recognizes that the applicant does not need to guarantee that the facility will provide perfect coverage within the Village, the Applicant must demonstrate that coverage will be significantly improved.

(Bd. Dec. at 6 (emphasis added).)

The Zoning Board concluded that AT&T failed to meet that standard.  (Id.)  Initially, the Board determined that AT&T "failed to meet the threshold requirement for its application in that it has failed to demonstrate a lack of coverage." (Id. at 7.)  The Board reasoned that Arceo testified "he had prepared the RF propagation maps . . . using computer simulation software and not actual drive test data . . . for only the 700MHz and 1900 MHz bands."  (Id.)  The Board also stated that, based on its own review of the propagation maps, it had determined "there would be minimal if any increase in coverage to those areas on the map shown in gray as having 'no reliable service'" were the Facility installed.  (Id.)  The Board cited members' comments that there appears to be only a "'very slight'" increase between the existing and projected coverage maps, and that the two diagrams "'look the same'" and "do[] not show 'a lot of additional coverage.'"  (Id.)  The Board also cited members' perceptions that the maps also showed only a "nominal" improvement in

10

service when antenna height was raised to 75 feet from 65 or 55 feet, and therefore concluded that AT&T "failed to demonstrate why a monopine of a lower height could not be constructed." (Id.)

Next, the Zoning Board found that AT&T had failed to "fully address[] the feasibility of other technologies," such as the potential use of an ODAS system. (Id.) The Board explained that its members had requested more information on the ODAS alternative, but that AT&T provided "no technical reports or data" supporting its claim that a shorter monopine and DAS system would provide worse coverage, and noted that Arceo had conceded that AT&T had not "conducted such design study to determine whether a DAS system could indeed help provide coverage via a less intrusive means." (Id. at 7–8 (citing ECF No. 55-18, Ex. E ¶ 5).)

Finally, the Board found that AT&T had failed to prove the Facility would not "significantly and adversely affect views from residential properties in the Village" or impact property values. (Id. at 8–9.) The Board stated that it was in receipt of several letters from Village residents claiming the Facility would "fundamentally alter" surrounding residential properties. (Id. at 8.) The Board reasoned that, "while the Applicant performed a visual sight test using a balloon for visibility testing, no notice was given to this Board or to the surrounding residents of the sight test and no views from the adjoining residential properties were taken." (Id.) The Board also noted that an adjoining property owner submitted an appraisal showing that "a reduction in the value of his home as being approximately 9.5%." (Id. at 8–9.) Although the Board noted the appraisal's limitations (namely, that the comparator property used by the appraiser was not actually comparable "due to differences such as school district, acreage and its location outside the Village"), the Board found that the appraiser had accounted for some limitations and that the report still "demonstrates that the public may be disinclined to purchase a home near a cell tower." (Id.)

In sum, the Board asserted that because AT&T failed to show a lack of coverage, the necessity of the proposed Facility height, and the absence of available alternatives, it had "not

11

bet[sic] its burden of demonstrating need or public necessity for the project," and also had not "met any of the criteria under the Code for its requested height and setback variances." (Id. at 8.)

## B. Procedural History

AT&T filed its Complaint on December 22, 2022. (See Compl.) In its Complaint, AT&T alleges violations of TCA Sections: 332(c)(7)(B)(ii) ("Count I"); 332(c)(7)(B)(i)(II) ("Count II"); and 332(c)(7)(B)(iii) ("Count III"), as well as Article 78 of the New York Civil Practice Laws and Rules ("CPLR") ("Count IV"). (See id.) Defendants answered the Complaint on February 24, 2023. (ECF No. 19.) Plaintiff now moves for summary judgment. (See Mot at 1.) The fully briefed motion was filed on July 18, 2025. (See ECF No. 55.)

## II.    DISCUSSION

## A. Applicable Law

### 1. Summary Judgment Standard

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Capitol Recs., LLC v. Vimeo, Inc., 125 F.4th 409, 418 (2d Cir. 2025) (quoting Fed. R. Civ. P. 56(a)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). In considering a summary judgment motion, the Court "is required to view the record in the light most favorable to the party against which summary judgment is contemplated and to resolve all ambiguities and draw all factual inferences in favor of that party." NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178 (2d Cir. 2008). If the moving party meets its burden of demonstrating the absence of a disputed issue of material fact, then the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial." Sheet Metal Workers' Nat'l Pension Fund v. Accra Sheetmetal, LLC, 993 F. Supp. 2d 245, 248

12

(E.D.N.Y. 2014); <u>see</u> Fed. R. Civ. P. 56(e).  The nonmoving party cannot rely solely on "conclusory allegations or unsubstantiated speculation" to defeat a motion for summary judgment. <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." <u>Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of New York</u>, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  "The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." <u>Brod v. Omya, Inc.</u>, 653 F.3d 156, 164 (2d Cir. 2011) (citing <u>Wilson v. NW Mut. Ins. Co.</u>, 625 F.3d 54, 60 (2d Cir. 2010)).  Therefore, the Court's goal at summary judgment "should be 'to isolate and dispose of factually unsupported claims.'" <u>Orange Cnty.-Poughkeepsie Ltd. P'ship v. Town of E. Fishkill</u>, 84 F. Supp. 3d 274, 294 (S.D.N.Y. 2015), <u>aff'd sub nom.</u>, <u>Orange Cnty.-Cnty. Poughkeepsie Ltd. P'ship v. Town of E. Fishkill</u>, 632 F. App'x 1 (2d Cir. 2015) (citing <u>Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.</u>, 386 F.3d 485, 495 (2d Cir. 2004)).

### 2.  The Telecommunications Act of 1996

The Telecommunications Act of 1996 ("TCA"), codified in part at 47 U.S.C. § 332, was enacted "to promote competition and higher quality in American telecommunications services and to encourage the rapid deployment of new telecommunications technologies." <u>City of Rancho Palos Verdes, Cal. v. Abrams</u>, 544 U.S. 113, 115 (2005) (citations and quotation marks omitted).  The TCA was intended "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services . . . by opening all telecommunications markets to competition[.]" <u>Cellular Tel. Co. v. Town of Oyster Bay</u>, 166 F.3d 490, 493 (2d Cir. 1999) (internal citations and quotation marks omitted.)  "One of the means by which [the TCA] sought to accomplish these goals was reduction of the impediments imposed by local governments upon

13

the installation of facilities for wireless communications, such as antenna towers." Id.   To that end, the TCA "preserved the authority of state and local governments over zoning and land use, but imposed limitations on that authority." New York SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 101 (2d Cir. 2010).

### a.        *Effective Prohibition Provision*

Under the TCA, local governments retain discretionary authority regarding the "placement, construction, and modification of personal wireless service facilities" in their towns.  47 U.S.C. § 332(c)(7)(A).  However, the TCA provides that "the regulation of the placement, construction, and modification of personal wireless service" cannot "prohibit or have the effect of prohibiting the provision of wireless services."  Id. § 332(c)(7)(B)(i)(II).  This provision, known as the effective prohibition provision, "precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines."  Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 643 (2d Cir. 1999). "To prevail on an effective prohibition claim, a plaintiff must demonstrate both that a significant gap exists in wireless coverage and that the proposed facility is the least intrusive means to close that gap." Indus. Tower & Wireless, LLC v. Roisman, No. 24-cv-2512, 2025 WL 3002379, at *1 (2d Cir. Oct. 27, 2025) (citing Willoth, 176 F.3d at 643; see also, e.g., T-Mobile Northeast LLC v. Town of Ramapo, 701 F. Supp. 2d 446, 456-57 (S.D.N.Y. 2009) (citing Willoth, 176 F.3d at 643). "Although the TCA does not specify a remedy for violations of [this] subsection . . . the majority of district courts that have heard these cases have held that the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits."  T–Mobile Northeast LLC v. Inc. Vill. of E. Hills, 779 F. Supp. 2d 256, 275 (E.D.N.Y. 2011) (internal citation and quotation marks omitted).

14

### b.      *Substantial Evidence Requirement*

The TCA also requires that "[a]ny decision by a State or local government to deny a request to place, construct, or modify personal wireless service facilities" must be: (i) "in writing" and (ii) "supported by substantial evidence contained in a written record." See 47 U.S.C. § 332(c)(7)(B)(iii).   "Substantial evidence requires less than a preponderance of the evidence, but more than a scintilla of evidence, and requires evaluation of the entire record." Indus. Tower & Wireless, LLC, 2025 WL 3002379, at *3 (citing Cellular Tel. Co., 166 F.3d at 494).  In determining whether a denial was supported by substantial evidence, "the record should be viewed in its entirety, including evidence opposed to the [local government's] view." Cellular Tel. Co., 166 F.3d at 494.  The Court must overturn a local government's decision "if it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [local government's] view."  New York SMSA Ltd. P'ship v. Inc. Vill. of Mineola, No. 01-cv-8211, 2003 WL 25787525, at *5 (E.D.N.Y. Mar. 26, 2003).  On the other hand, "[i]f the Court finds that even one reason given for the denial is supported by substantial evidence, the decision of the local zoning body cannot be disturbed." Id.

"When evaluating the evidence, state and local zoning laws govern the weight to be given the evidence." Cellular Tel. Co., 166 F.3d at 494.  Under New York law, wireless providers are public utilities for the purposes of zoning applications. Id. (citing Cellular Tel. Co. v. Rosenberg, 82 N.Y.2d 364, 371 (1993)).  As such, providers' applications are reviewed under New York's "public utility standard," which provides that, "a local zoning board must consider whether the public utility has shown a 'need for its facilities' and whether the needs of the broader public would be served by granting the variance." Id. (quoting Consol. Edison Co. v. Hoffman, 43 N.Y.2d 598 (1978)).

15

**B.  Analysis**

AT&T argues that the Denial constitutes an effective prohibition of services, in violation of 332(C)(7)(B)(i)(II) of the TCA, and was not supported by substantial evidence, in violation of § 332(c)(7)(B)(iii) of the TCA.  (Mot. at 1).  The Court agrees and will address each argument in turn.

**1.  Effective Prohibition Claim**

AT&T argues that the Denial had the effect of a prohibition of services because the identified service gap is significant and Defendants failed to show a viable, available, less intrusive alternative.  (Mot. at 18-23.)  The Court agrees.

**a.      *Significant Gap in Coverage***

To establish the first prong of an effective prohibition claim, a plaintiff must demonstrate the existence of a significant gap in wireless coverage.  The determination of whether such a gap exists is fact-bound, and "[t]here are no magic numbers or percentages that constitute a significant gap." Orange Cnty.-Poughkeepsie Ltd. P'ship, 84 F. Supp. 3d at 297 (citing Liberty Towers, LLC v. Zoning Hearing Bd. of Falls Tp., Bucks Cnty., Pa., No. 10-cv-7149, 2011 WL 6091081, at *8 (E.D. Pa. Dec. 6, 2011)).  In assessing whether a coverage gap is significant, courts consider factors such as the physical size of the gap, the geographic area affected, the number of users impacted, and whether all of the carrier's users in the area are similarly affected by the gap.  See Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 49 (1st Cir. 2009).  Courts also consider whether the alleged gap impairs the plaintiff's ability to provide reliable outdoor, in-vehicle, and in-building coverage. Orange Cnty.-Poughkeepsie Ltd. P'ship, 84 F. Supp. 3d at 297.  To make these determinations, courts commonly rely on RF reports, expert testimony, propagation maps, and field test data. Id. at 298.

16

AT&T's submissions to Defendants—including RF analyses, expert testimony, and propagation maps—demonstrate the existence of a significant gap in the relevant service area. The initial RF analysis submitted with the Application identified an over one-mile stretch of road between Berry Hill Road and Cove Road, traveled by over 16,000 vehicles per day, where AT&T is unable to provide reliable in-vehicle service. (See Pl. 56.1 Stmt. ¶¶ 10, 18 (citing Arceo Aff. ¶¶ 4, 9, Ex. C, D).) It also identified an additional 0.4-mile stretch south of that intersection where AT&T cannot provide reliable in-building coverage. (Id. ¶ 11.) That analysis included propagation maps documenting gaps in current coverage. (Arceo Aff. Ex. C, D.). AT&T also provided the Boards with multiple additional RF analyses and propagation maps, as well as expert testimony from Arceo confirming the gap. In connection with the instant motion, AT&T submitted an additional expert report from another qualified RF engineer incorporating RF modeling and drive testing, which confirms the existence and scope of the gap. (See Villecco Report at 8–9, 11, 16.)

Courts have repeatedly found gaps of comparable size and impact to be "significant" under the first prong of the effective prohibition analysis. See, e.g., Orange Cnty.-Poughkeepsie Ltd. P'ship, 84 F. Supp. 3d at 299 (finding "significant" a gap comprised of two stretches of highway that were 1.6 and two miles long and used by approximately 35,000 commuters per day); New York SMSA Ltd. P'ship v. Vill. of Floral Park, 812 F. Supp. 2d 143, 154 (E.D.N.Y. 2011) (finding "significant" a gap measuring "approximately 1.2. miles north to south . . . and approximately .6 miles east to west"). Here, the gap is not confined to a remote or "sparsely populated rural area"; rather, it affects a heavily trafficked area, impacting thousands of daily commuters along Route 25A. See Willoth, 176 F.3d at 643–44 (explaining that "[w]here the holes in coverage are very limited in number or size (such as the interiors of buildings in a sparsely populated rural area, or confined to a limited number of houses or spots as the area covered by buildings increases) the

lack of coverage likely will be <u>de minimis</u> so that denying applications to construct towers necessary to fill these holes will not amount to a prohibition of service").

Defendants do not seriously dispute that, if established, the gap would be "significant." Instead, Defendants challenge the reliability of AT&T's evidence demonstrating the existence of a gap. Specifically, Defendants contend—as the Zoning Board concluded in its Denial—that AT&T's showing is insufficient because: (1) its propagation studies analyze only certain frequencies and therefore do not demonstrate a lack of signal strength across all relevant frequencies; and (2) the maps are computer-generated and are not supported by adequate "real world" testing data.[8] (Def. Opp. at 5–8, 14.) Both arguments fail.

First, it is undisputed that 700 MHz is the lowest frequency band at which AT&T operates to provide access to its network. (Def. Resp. 56.1 Stmt. ¶ 13.A). It is also undisputed that higher-frequency signals propagate over shorter distances than lower-frequency signals. (<u>Id.</u> ¶ 13.) Accordingly, if a gap exists at lower frequencies, it necessarily would be equal or greater at higher frequencies. (<u>Id.</u> ¶ 13.B.) AT&T was not required to model every possible frequency band to establish a coverage gap, as including higher bands would only confirm the existence of the gap. See, e.g., <u>Orange Cnty.-Poughkeepsie Ltd. P'ship</u>, 84 F. Supp. 3d at 299 (provider established the proposed facility was necessary to provide coverage at 700, 850, and 1900 MHz).[9]

---

[8] Defendants also claim, in response to multiple of AT&T's 56.1 statements, that "[t]he unreliable propagation maps reflect the fact that reliable access is provided" to both in-vehicle and in-building users. (<u>See, e.g.,</u> Def. Resp. 56.1 Stmt. ¶¶ 10–12.) For those propositions, Defendants cite, without explanation, "See Exhibit C; Exhibit G at VOBC.1389–1391." (<u>Id.</u>) Defendants' "Exhibit C" is AT&T's own propagation maps and Defendants' "Exhibit G" contains a citation to AT&T's counsel's explanation of those maps at the Zoning Board's November 22, 2022 hearing. Defendants' citations do not support the proposition for which they are offered and therefore fail to raise a genuine dispute of material fact.

[9] Defendants' reliance on <u>Crown Castle NG LLC v. Town of Hempstead</u>, No. 17- cv-3148, 2018 WL 6605857, at *8 (E.D.N.Y. Dec. 17, 2018), is misplaced. In that case, the provider premised its alleged coverage gap on an inability to provide "4G LTE" service, and the court held no actionable gap existed because voice calls could still be carried over 3G networks. <u>Id.</u> (explaining that "[a] gap in 4G coverage does not establish that the target area is underserved by voice cellular telephone service," and that the TCA affords heightened protection only where there is a deficit in "'the ability of wireless telephones to have access to land-lines'") (quoting <u>Willoth</u>, 176 F.3d at 643). That reasoning does not apply here. As AT&T explains, the distinction between 3G and 4G is conceptually different from the use of different frequency bands. (Mot. at 5, n.7.) Moreover, AT&T does not premise its Application on any single

18

Defendants' second argument, that AT&T's propagation maps are unreliable, fares no better.  Defendants do not identify any admissible evidence in the record contradicting AT&T's propagation maps or suggesting that the gap is materially different from what AT&T's RF analyses demonstrate.  Nor do they offer any evidence that undermines the reliability of the maps.  Instead, Defendants rely, as the Board did, on residents' lay observations about coverage and subjective assertions that the maps are confusing and "look the same." (Bd. Dec. at 7–8; see Def. Res. 56.1 Stmt. ¶ 96 (citing Lerner Dep. 45:7).)  Those assertions are plainly insufficient to rebut uncontroverted evidence from AT&T's qualified RF engineers.  For example, the residents' testimony about making calls or having coverage does not specify key details such as their exact location at the time of call, the time of day, the device model used, or whether they were even using AT&T.  (See e.g., 11-22-22 Tr., 135:9–136:16; Lerner Dep. 45:7; 8-16-22 Tr. 143:3–144:3).  Moreover, the mere fact that some users can make calls does not undermine AT&T's claim that it lacks reliable service in the area, even if it were supported by competent evidence (which it is not here).  Several courts in this Circuit have held that a gap in service under the TCA must be evaluated from the perspective of the provider, so the fact "that that other wireless providers already have service in that area" does not defeat a provider's coverage gap claim.  See Inc. Vill. of E. Hills, 779 F. Supp. 2d at 272 (citing MetroPCS New York, LLC v. Vill. of E. Hills, 764 F. Supp. 2d 441, 456 (E.D.N.Y. 2011)).

Defendants also argue, as the Zoning Board concluded in its Denial, that AT&T should have submitted additional evidence in the form of "dropped call rates" or "actual drive test data."[10]

---

frequency band.  Rather, as AT&T's RF engineer explains, AT&T analyzed 700 and 1900 MHz because those are the primary and most widely used frequency bands on which AT&T relies to provide service, and because 700 MHz is the lowest frequency band at which AT&T operates to provide reliable access to its network.  (Pl. 56.1 Stmt. ¶ 13.A; see ECF No. 55-18, Ex. E ¶ 7.)

[10] Defendants also argue that AT&T should have provided "substantiated NTSB data as to the amount of traffic on Route 25A." (Def. Opp. at 7.)  However, Defendants do not dispute that "[o]ver 16,000 vehicles a day travel through the Service Gap on Rt. 25A." (Def. Res. 56.1 Stmt. ¶ 18.)

19

(Def. Opp. at 7; see Bd. Dec. at 7.)  Initially, as AT&T points out, Oyster Bay's own Code required the submission of propagation maps, not drive-test data, and neither Board requested drive testing results during the application process.  See, e.g., Village of Oyster Bay Cove, N.Y., Code § 320-28(I), https://ecode360.com/10369297 (providing that applicants must provide "'[b]efore' and 'after' propagation studies prepared by a qualified radio frequency (RF) engineer demonstrating existing signal coverage, contrasted with the proposed signal coverage resulting from the proposed telecommunication facility").  Moreover, Defendants point to no evidence in the record establishing that propagation studies are less reliable than, or inferior to, drive-test data.

"[W]here, as here, the Village Code does not require a showing of a coverage deficiency by a specific type of evidence, '[t]he fact that the Board apparently would have preferred some other type of data . . . does not provide a valid basis for denying plaintiff's application.'"  Extenet Sys., LLC. v. Vill. of Kings Point, 2022 WL 1749200, at *13 (E.D.N.Y. May 31, 2022), aff'd sub nom. Extenet Sys., LLC. v. Vill. of Kings Point, No. 22-1265, 2023 WL 4044076 (2d Cir. June 16, 2023) (quoting ExteNet Systems, Inc. v. Vill. of Plandome, No. 19-cv-7054, 2021 WL 4449453, at *17 (E.D.N.Y. Sept. 29, 2021)); see also Orange Cnty.-Poughkeepsie Ltd. P'ship, 84 F. Supp. 3d at 304–05 ("[N]othing in the Code or the TCA requires that Plaintiffs present data on dropped calls or customer dissatisfaction, and, accordingly, it is not, without more, an adequate basis on which to deny the Application.").  Additionally, although they were not required to, the Court notes that in connection with the instant motion, AT&T submitted another RF report, which provides drive test data reflecting the "actual field measured signal level of the AT&T service in the area" in all four frequency bands and confirms the propagation studies' results.  (See Villecco Report at 7–8 (summarizing the drive test results and explaining that they confirm "that AT&T lacks reliable wireless service throughout a substantial area in and around Oyster Bay Cove."))

20

In sum, AT&T sufficiently demonstrated a gap in coverage, and, in the absence of any contrary technical evidence, Defendants' speculative criticisms about AT&T's evidence do not create a genuine dispute of material fact.

### b.  *Least Intrusive Means*

Under the second prong of the effective prohibition analysis, "a local government may deny an applicant's proposal if an applicant may 'select a less sensitive site, . . . reduce the tower height, . . . use a preexisting structure or . . . camouflage the tower and/or antennae." Orange Cnty.-Poughkeepsie Ltd. P'ship, 84 F. Supp. 3d at 300 (citing Willoth, 176 F.3d at 643). An applicant "need not evaluate every potential alternative,'" but must instead make "'a good faith effort to evaluate alternative sites.'" New York SMSA Ltd. P'ship v. Town of Oyster Bay, No. 11-cv-3077, 2013 WL 4495183, at *18 (E.D.N.Y. Aug. 16, 2013) (citing Vill. of Floral Park, 812 F. Supp. 2d at 166) (finding Verizon was not required to "evaluate every potential location where the Facility hypothetically could be constructed, and submit evidence showing why each site is not a viable alternative.").

Here, AT&T made a good faith effort to evaluate available alternatives. As discussed above, AT&T investigated numerous alternative sites and reasonably concluded that no viable alternatives existed and that there were no preexisting structures capable of hosting the Facility. (See e.g., ECF No. 55-10.)  AT&T selected what it deemed the least intrusive option: a camouflaged "monopine" on a non-residential lot, designed to blend in with nearby tall trees. (See id.)

Defendants do not dispute that no "less sensitive site" was viable. Instead, they argue that AT&T failed to justify why a shorter tower, an ODAS system, or a combination of the two, could not remedy the gap. (Def. Opp. at 15.)  Defendants' arguments are squarely foreclosed by the record.

21

First, as to tower height, AT&T submitted RF evidence demonstrating that reducing the tower height from 75 to 55 feet would significantly decrease both in-building and in-vehicle coverage and would substantially undermine the Facility's ability to remedy the gap. (Arceo Aff ¶¶ 7-8, 10, Ex. D–J; see Villecco Report at 25.) Defendants offer no contrary evidence and appear to concede that a shorter tower would reduce coverage. Defendants argue that the TCA does not require "100% coverage." (Def. Opp. at 17 (citing SiteTech Grp. Ltd. v. Bd. of Zoning Appeals of the Town of Brookhaven, 140 F. Supp. 2d 255, 265 (E.D.N.Y. 2001)). That argument is inapposite; the question for this Court to consider is whether the shorter tower is a viable alternative. AT&T has shown that reducing the monopole's height would result in a "substantial reduction" in service and therefore it is not a viable alternative. (See Villecco Report at 25). Defendants have failed to put forth evidence to the contrary. In any event, Defendants have not even shown that reducing the height would make the monopine any less intrusive. According to AT&T's unrebutted evidence, because any views from neighboring homes "would be of the middle of the monopine through the trees," visibility to nearby residences would not change. (Allen Report at 18.).

The same is true of the ODAS alternative. AT&T submitted evidence that the ODAS system, like the shorter monopine, would be ineffective because antennas below the tree line cannot provide reliable in-building service in heavily-wooded settings like the service gap area— a fact that Defendants do not rebut. (Def. Resp. 56.1 Stmt. ¶ 81 (citing ECF No. 55-18, Ex. E ¶ 5).) AT&T also submitted evidence that the ODAS system suffers from multiple other deficiencies and practical barriers, such as its lack of backup power and the need to secure independent leases and separate approvals for every node. Defendants offer no evidence to rebut AT&T's submissions, and instead merely cite the Board's baseless conclusion that AT&T failed to fully address the ODAS alternative. (See Def. Resp. 56.1 Stmt. ¶¶ 90–92.)

Defendants' argument regarding a newly proposed hybrid alternative—a shorter tower combined with ODAS—is also unavailing.  Initially, this alternative appears to have been raised for the first time in this motion, so Defendants cannot plausibly assert that AT&T refused to investigate it.  In any event, it is contradicted by AT&T's evidence that both a shorter tower and an ODAS system would fail for the same reason: insufficient height above the tree line.  (See Mot. at 14; see also ECF No. 55-18, Ex. E ¶ 5.)  Defendants provide no explanation for why combining two ineffective solutions would produce an effective one.  The TCA does not allow denial based on speculative or impractical alternatives that are unlikely to succeed.  See, e.g., MetroPCS N.Y. LLC v. City of Mount Vernon, 739 F. Supp. 2d 409, 423 (S.D.N.Y. 2010) (finding "it was improper for the City to insist on the use of alternative technology because there was no evidence that MetroPCS's application was otherwise deficient"); cf. Town of Clarkstown, 612 F.3d at 105–107 (holding that the TCA preempted a town statute setting forth a preference for alternate technologies over other FCC-authorized technologies).

In sum, the record establishes that Plaintiff made the required good-faith effort to evaluate alternatives and reasonably concluded that none would remedy the gap in a less intrusive manner than the proposed Facility.  Because AT&T has established that the service area suffers from a significant service gap and that its proposed Facility is the least intrusive means for closing that gap, AT&T is entitled to summary judgment on its effective prohibition claim.

## 2.  Substantial Evidence Claim

As mentioned, in evaluating a substantial evidence claim under the TCA, courts look to the applicable standard under state law.  Cellular Tel. Co., 166 F.3d at 494. Here, the Court looks to New York law, which provides the requirements that a public wireless services provider, like AT&T, must meet to establish the need for a variance, and provides that "[r]ather than granting a variance only on a showing of 'unnecessary hardship,' a local zoning board must consider whether

the public utility has shown 'a need for its facilities' and whether the needs of the broader public would be served by granting the variance." Id. (quoting Consol. Edison Co., 43 N.Y.2d at 608–10). "[W]here the intrusion or burden on the community is minimal, the showing required by the utility should be correspondingly reduced." Town of LaGrange, 658 F. Supp. 2d 539, 555 (S.D.N.Y. 2009) (quoting Consol. Edison Co., 43 N.Y.2d at 611).

Under this standard—sometimes referred to as the "public necessity" or "public utility" standard—a provider seeking a variance for a facility "'need only establish [1] that there are gaps in service, [2] that the location of the proposed facility will remedy those gaps and [3] that the facility presents a minimal intrusion on the community.'" Vill. of Floral Park, 812 F. Supp. 2d at 154 (quoting Site Acquisitions, Inc. v. Town of New Scotland, 2 A.D.3d 1135 (3d Dep't 2003)). "If the public utility makes the required showing, which necessarily means the record is devoid of substantial evidence to support a denial, the variance must issue." Id.

The Court concludes that the reasons for the Board's denial—that (1) there was no significant gap; (2) AT&T failed to show the Facility would result in more than nominal improvement in coverage; (3) AT&T failed to adequately investigate alternatives; and (4) the Facility would cause aesthetic harm and a decrease in property values—are not supported by substantial evidence under these substantive standards.[11]

---

[11] AT&T also argues that the Zoning Board applied the wrong standard of review. (See Mot. at 9–11.) The Board appears to have articulated a formulation of the "effective prohibition" standard, requiring AT&T to demonstrate the existence of "significant gaps" in service and that the proposed facility was the "least intrusive means" of remedying those gaps. (Bd. Dec. at 6.) AT&T is correct that this is not the applicable standard. As many courts have recognized, "[i]n the context of a substantial evidence claim involving the public necessity standard applicable to utilities in New York, 'the carrier must demonstrate not that the proposed facility was the 'least intrusive means' [to remedy the service gap] but rather that the proposed facility was 'more feasible than other options.'" New Cingular Wireless PCS, LLC v. Town of Fenton, 843 F. Supp. 2d 236, 245 (N.D.N.Y. 2012) (citing Vill. of Floral Park, 812 F. Supp. 2d at 164). However, later in its decision, the Board concluded that AT&T had not met its burden because it failed to demonstrate "the overall public necessity for the project" and "the absence of other available alternatives," which more closely resembles the public necessity standard. The Board's analysis appears to conflate the two standards. Because the Court resolves AT&T's motion on other grounds, it need not address whether the Board's misstatement of the applicable standard of review provides an independent basis for deciding the motion.

### a.        Lack of Need

The Board's first three stated reasons for denying the Application all rest on its conclusion that there was no demonstrated need for the Facility.

First, the Denial asserts that AT&T's "failed to substantiate its conclusory statement that there is a significant coverage gap." (Bd. Dec. at 7.)  That assertion is not supported by the record. As discussed above, AT&T submitted detailed evidence showing the gap's size, its location, and the population impacted.   Although the Board was not required to accept AT&T's expert testimony, there was no contrary expert testimony (or indeed, any evidence at all) to contradict it. See Vill. of Floral Park, 812 F. Supp. 2d at 161 ("To refute the expert testimony, the Board could have presented its own expert testimony or evidence.").  Indeed, the Village's planning consultant acknowledged that a service gap exists in the area. (See ECF No. 55-12 Ex. A.)

The Board bases its conclusion on the assertions that: (1) AT&T's propagation studies covered only two of four frequency bands; and (2) were not backed up by real-world drive-test data. The Court already explained why these arguments are meritless in the context of AT&T's effective prohibition claim.  For similar reasons, these arguments also fail under the substantial evidence framework.  AT&T presented evidence that the gap was significant at 700 MHz, the lowest frequency band at which it operates, and the Board had no reason to believe the gap would somehow be smaller at higher frequencies. (See Def. Resp. 56.1 Stmt. ¶ 13.)  Moreover, nothing in the Code or the TCA requires an applicant to present drive-test data, and the absence of that data is not, by itself, a valid basis for the Board's Denial.  See, e.g., MetroPCS New York, LLC, 764 F. Supp at 454 (holding the absence of customers' testimony regarding poor coverage was "not fatal to the application" where plaintiff's other evidence showed a coverage gap).

The Board's second and third reasons fail for similar reasons.  The only record support for the Board's assertion that the Facility would result in merely a "nominal" improvement in service

25

consists of lay observations from Board members and the public that the maps "'look the same'" and any improvement would be "'very slight.'" (Bd. Dec. at 7.) These conclusory statements and observations have no probative value and are certainly insufficient to constitute substantial evidence. These lay observations do not undermine the conclusions in the report and maps which show that AT&T lacks reliable in-building and in-vehicle coverage in the service gap and that the Facility would improve coverage. The Board gives no explanation for why those members were qualified to interpret technical propagation studies, nor does it offer evidence rebutting the expert testimony from AT&T's qualified RF engineers about the service improvement from the Facility. (See, e.g., Orange Cnty.-Poughkeepsie Ltd. P'ship, 84 F. Supp. 3d at 309 (citing Vill. Of Floral Park, 812 F. Supp. 2d at 160) ("Indeed, the Board was entitled to question [AT&T's] 'experts credentials or the methodology used by the experts in arriving at their opinions,' but it did not.").

The Board's claim that AT&T failed to adequately investigate alternative options—specifically, a shorter antenna and the ODAS system—is likewise not supported by the record. Under New York's public necessity standard, AT&T was not required to show that the Facility was the "'least intrusive means'" to remedy the service gap, but rather that it was "'more feasible than other options.'" Town of Fenton, 843 F. Supp. 2d at 245, citing Vill. of Floral Park, 812 F. Supp. 2d at 164. The record shows that AT&T more than met that burden.

As discussed, AT&T put forth evidence showing that both a shorter antenna and an ODAS system would fail to remedy the service gap and would substantially diminish the service improvements the proposed Facility would provide. The Board's assertion that AT&T failed to submit "technical reports and data supporting this claim" is contradicted by the record. AT&T submitted propagation maps and supporting data quantifying the reduction in coverage associated with a shorter tower. AT&T also provided a sufficiently detailed technical explanation as to why an ODAS system would be ineffective for same reasons. AT&T was not required to submit precise

data regarding an ODAS system after it determined such a system was not feasible and would not be effective, and there was no evidence to the contrary before the Board.  See, e.g., Town of Oyster Bay, 2013 WL 4495183, at *18 ("The Board is required to support its decision with substantial evidence that the alternative sites were feasible."); cf. MetroPCS New York, LLC v. City of Mount Vernon, 739 F. Supp. 2d 409, 420 (S.D.N.Y. 2010) (MetroPCS was not required to demonstrate why a distributed antenna system was less feasible than its proposed facility because the City failed to present any evidence that MetroPCS's proposal was either infeasible or overly obtrusive).

In sum, the Court finds that AT&T sufficiently established "'that there are gaps in service' along the targeted area, and that 'the location of the proposed [F]acility will remedy those gaps,' as required by State law." Orange Cnty.-Poughkeepsie Ltd. P'ship, 84 F. Supp. 3d at 306 (quoting Vill. of Floral Park, 812 F. Supp. 2d at 154).  The Board's decision to the contrary was not supported by substantial evidence.

### b.    Intrusion on the Community

Finally, the Court finds that the Board's claims about aesthetics and property values were not grounded in substantial evidence and do not support a finding that the Facility would result in more than a minimal intrusion.

"In evaluating a denial of a permit pursuant to the TCA, a court 'can find that aesthetics qualify as a permissible grounds for denial of a permit only if [it] can conclude that there was more than a scintilla of evidence before the Board on the negative visual impact of the cell sites.'" Orange Cnty.-Poughkeepsie Ltd. P'ship, 84 F. Supp. 3d at 309 (quoting Cellular Tel. Co., 166 F.3d at 495).  "In other words, 'aesthetic concerns must be grounded in substantial evidence in the record.'"  Id. (citing Town of Oyster Bay, 2013 WL 4495183, at *14).  "Objections based on aesthetic grounds should be 'articulate[d] specifically,' and cannot be premised on a 'few generalized expressions of concern.'"  Id. (quoting Cellular Tel. Co., 166 F.3d at 495–96).

27

The Board claimed that AT&T failed to prove "the proposed 85 foot tower will not significantly and adversely affect views from residential properties in the Village" or impact property values. (Bd. Dec. at 8–9.)  However, the Board failed to articulate any specific aesthetic objections to the Facility.  Instead, it relied solely on generalized statements that it had received letters from residents claiming the Facility would "fundamentally alter" their properties.  (Id. at 8.) The Board did not explain the basis for those assertions, nor did it meaningfully engage with AT&T's contrary evidence, including photo simulations demonstrating the Facility would be barely visible and masked from most angles by nearby tall trees.  (See ECF No. 55-8.)  Rather than address that evidence, the Board merely noted that AT&T "performed a visual sight test" but that "no notice was given" to the Board and "no views from the adjoining residential properties were taken."  (Id.). These criticisms do not constitute substantial evidence of an adverse aesthetic impact.

Defendants similarly rely on boilerplate assertions in response to multiple statements of fact, claiming that "[a] plethora of testimony, documentary evidence, drone footage, and photographs demonstrate that the monopole will be highly visible to residents, drivers, and other pedestrians during each season (more visible in winter because of less coverage), will not simply blend into the background, will not be invisible from nearby houses . . . and will be an absolute eyesore for this historically bucolic area." (Def. Resp. 56.1 Stmt. ¶¶ 74–80.)  These conclusory characterizations are insufficient to create a genuine dispute of fact.

Indeed, Defendants concede the Facility would not be widely visible from the Village in general or from adjacent neighborhoods and would not have any significant environmental impact. (Id. ¶¶ 72–73.)  Courts have found that facilities with such limited visibility are no more than minimally intrusive, even facilities that rise far taller above the tree line than this one.  See, e.g., Cellco P'ship v. Town of Clifton Park, New York, 365 F. Supp. 3d 248, 259 (N.D.N.Y. 2019)

28

(100-foot tall monopine visible from a few properties was not more than minimally intrusive); Orange Cnty.-Poughkeepsie Ltd. P'ship, 84 F. Supp. 3d at 308–310 (approximately 150-foot monopole that will extend "at least up to 75 to 85 feet above the tree line" was no more than minimally intrusive).

There is likewise no substantial evidence supporting the Board's reliance on the Sorkin appraisal over AT&T's appraisal, which concluded that the proposed Facility would have no impact on property value and identified significant methodological flaws in the Sorkin report. Specifically, AT&T's appraisal notes that the purported "comparable" Facility which the Sorkin appraisal based its findings on was a large, highly prominent water tank. The Board's decision to deny the Application on property value grounds is, therefore, not supported by substantial evidence. Cf. id. (concluding that an appraisal report which presented "generalized concerns about a potential decrease in property values, especially in light of [Plaintiffs'] contradictory expert testimony, was not adequate to support a conclusion.").

Therefore, AT&T is entitled to summary judgment on its substantial evidence claim.

## C. **Remedy**

AT&T also argues that an order mandating approval is the proper remedy. (Mot. at 23–24.) The TCA does not specify a remedy for violations; however, "almost all courts to address the question have held that 'the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits.'" Town of Ramapo, 701 F. Supp. 2d at 463 (citing Cellular Tel. Co., 166 F.3d at 497); see also Vill. of Kings Point, 2022 WL 1749200, at *13 ("Courts have consistently found that a mandatory injunction is an appropriate remedy for violations of the TCA.") (cleaned up). "Moreover, under Willoth, a violation of the effective prohibition provision, 47 U.S.C. § 332(c)(7)(B)(i)(II), requires injunctive relief: an application proposing the 'least intrusive means

29

for closing a significant [coverage] gap' cannot be denied—or, put differently, it must be granted."

Id. (citing Willoth, 176 F.3d at 643).

Here, as the Denial violates the effective prohibition provision and is not supported by substantial evidence, the Court finds that Defendants should be ordered to grant AT&T all permits and approvals necessary for the construction, operation, and maintenance of the proposed Facility.[12]

## III.    CONCLUSION

For the reasons stated above, AT&T's motion for summary judgment and request for injunctive relief, (ECF No. 55), are GRANTED.  The Court orders that the Board shall, within thirty days of this order, grant the Application and issue all permits and approvals necessary for the construction, operation, and maintenance of the Facility that is the subject of this Action.  The Clerk of the Court is respectfully requested to terminate the pending motion, enter judgment for Plaintiff, and close this case.

**SO ORDERED.**

Dated:    March 31, 2026
          Central Islip, New York

---

[12] Defendants do not address this issue of remedy, never responded to AT&T's arguments, and have never offered any reason why injunctive relief compelling approval of the Application should not be entered against all Defendants. Although the Planning Board has not yet reached a decision on AT&T's Application, the time for doing so has passed, as it ran concurrently with the Zoning Board's deadline and therefore expired on November 22, 2022.  (Def. Resp. 56.1 Stmt. ¶¶ 51, 62; see 47 C.F.R. § 1.6003(c), (e) (defining 150 days as the presumptively reasonable time for review of an application to deploy a facility using a new structure); see also FCC Declaratory Ruling, 24 FCC rcd. 13994, 14006 (¶¶ 32, 45) (2009) ("FCC Shot Clock Ruling") (explaining that a reviewing authority has 150 days to act on a new tower application, and that failure to do so is presumptively unreasonable under Section 332(c)(7)(B) of the TCA)).  Even when a Board has not yet reached a decision on an Application, courts have granted injunctions ordering approval when there is both a "shot clock" violation and a violation of the TCA's "effective prohibition" provision. See, e.g., Bell Atl. Mobile of Rochester L.P. v. Town of Irondequoit, N.Y., 848 F. Supp. 2d 391, 403 (W.D.N.Y. 2012); Upstate Cellular Network v. City of Auburn, 257 F. Supp. 3d 309, 315 (N.D.N.Y. 2017); see also Masterpage Commc'ns, Inc. v. Town of Olive, N.Y., 418 F. Supp. 2d 66 (N.D.N.Y. 2005) (granting injunctive relief for the violation of § 332(c)(7)(B)(ii)'s requirement to act "within a reasonable time").  Given that the "shot clock" has clearly expired, the record is fully developed, and effective prohibition has been established, the Court finds that further review by the Planning Board "would serve no useful purpose and would greatly prejudice [AT&T] by encouraging additional delay in its ability to provide service to the public in a non-covered area."  Bell Atl. Mobile of Rochester L.P., 848 F. Supp. 2d at 403.

_____
                /s/ JMA
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE